Filed 11/13/18 (unmodified opinion attached)

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JESUS CUITLAHUAC GARCIA, | D072521 |
| Plaintiff and Appellant, | (Super. Ct. No. ECU08922) |
| v. | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| BORDER TRANSPORTATION GROUP, LLC et al., | |
| Defendants and Respondents. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed October 22, 2018, be modified as follows:

1.     The entire paragraph commencing at the bottom of page 22 with "We follow the approach" and ending at the top of page 23 is deleted and the following paragraph is inserted in its place:

> We follow the approach of the Court of Appeal in *Dynamex* on our record.  It is logical to apply the "suffer or permit to work" standard (and the ABC test that explicates it) to wage order claims.  First, the wage order explicitly defines "employ" in this language, and the case law emphasizes "the primacy of statutory purpose in resolving the employee or independent contractor question."  (*Dynamex, supra*, 4

---

[*]     Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of the discussion section, parts 1 and 5.

Cal.5th at p. 948.)  Second, wage orders regulate very *basic* working conditions for covered California employees, thus warranting " 'the broadest definition' " of employment to extend protections to "the widest class of workers."  (See *id.* at pp. 913, 951; Cal. Code Regs., tit. 8, § 11090, subd. 1.)  There is no reason to apply the ABC test categorically to every working relationship, particularly when *Borello* appears to remain the standard for worker's compensation.  Although both parties agree *Dynamex* applies to Garcia's case, neither identifies a basis to use the ABC test in evaluating the non-wage-order claims.  In the absence of an argument that the statutory purposes underlying those claims compel application of a different standard, we conclude *Borello* furnishes the proper standard as to Garcia's non-wage-order claims.

2.      At the end of the top paragraph of page 23, after the sentence "as to Garcia's non-wage-order claims" add the following as footnote 11, which will require renumbering of all subsequent footnotes:

Appreciating "the primacy of statutory purpose in resolving the employee or independent contractor question" (*Dynamex, supra,* 4 Cal.5th at p. 948), we express no opinion on the appropriate test on different records in other situations.

3.      On page 27, in the fourth sentence of the second full paragraph, the word "it" is changed to "*Kirby*" so the sentence reads:

As *Kirby* explained:

4.      On the top of page 28, in the first sentence beginning "Because *Dynamex* favorably cites," the words "footnote 30 in" are to be inserted between "Because" and "*Dynamex*" so that the sentence reads:

Because footnote 30 in *Dynamex* favorably cites *JSF Promotions* to define part C, we follow the *Kirby* approach and reject *Sebago*'s alternative construction.

2

5.     The entire paragraph commencing at the bottom of page 28 with " Under the more stringent part C" and ending at the top of page 29 is deleted and the following paragraph is inserted in its place:

> Under the more stringent part C framework adopted by the California Supreme Court in *Dynamex*, the result is obvious. *Dynamex* requires more than mere capability to engage in an independent business. Defendants presented no evidence in their moving papers that Garcia in fact provided services for other entities or otherwise established a business "independent" of his relationship with BTG. (See *Kirby, supra,* 176 A.3d at pp. 1187-1188 [certain factors besides performing similar work for third parties may also be relevant to part C].) Rather, they rely on the *Sebago* formulation and suggest Garcia was "free to offer his services as an entrepreneur to anyone he chose."

6.     At the end of the top paragraph of page 29, after the sentence " 'free to offer his services as an entrepreneur to anyone he chose' " add the following as footnote 13:

3

For the first time in their petition for rehearing defendants attempt to argue that under a "totality of the circumstances" test (see *Kirby, supra,* 176 A.3d at p. 1188), factors other than the actual performance of similar work for other parties show that Garcia was an independent contractor rather than an employee. Most of this argument merely rehashes the "control" evidence defendants previously submitted to support the inapplicable *Borello* test, such as BTG's lack of training or supervision or Garcia's retention of fares. Defendants' suggestion that Garcia's taxicab amounts to an independent place of business akin to a "home office" is patently unpersuasive—Garcia made lease payments at BTG's office and had no separate business address. As to their reference to business cards, Garcia testified that *BTG* provided him with business cards; he could *not* advertise his services as "Garcia Taxicab" or the like; he opted to list his cell phone number on the cards *alongside* two numbers for the company; and he did not advertise his business in the Yellow Pages, newspaper, or any other source. Although Garcia had a city-issued permit, it was *specific* as to BTG. (Calexico Mun. Code, ch. 5.80, § 5.80.140.) BTG admits it provided third party liability insurance, and Garcia's *ability* to procure additional coverage does not show he *is* customarily engaged in an independently established business. Although Garcia did operate his own vehicle for a time, he purchased that vehicle from Martha Ortega, the former sole proprietor of Calexico Taxi, and operated it as a Calexico Taxi with BTG's vehicle permit. He then leased a vehicle *from BTG* starting in August 2013 when his own vehicle became inoperable.

**There is no change in the judgment.**

The petition for rehearing is denied.

                                                                HALLER, Acting P. J.

Copies to: All parties

4

Filed 10/22/18 (unmodified version)

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JESUS CUITLAHUAC GARCIA, | D072521 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. ECU08922) |
| BORDER TRANSPORTATION GROUP, LLC et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Imperial County, Diane B. Altamirano, Judge.  Reversed and remanded with instructions.

Law Offices of Francisco Javier Aldana and Francisco J. Aldana for Plaintiff and Appellant.

Wheatley Bingham & Bakker and Roger P. Bingham for Defendants and Respondents.

_____

[*]     Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of the discussion section, parts 1 and 5.

Plaintiff Jesus Cuitlahuac Garcia filed a wage and hour lawsuit against Border Transportation Group, LLC (BTG), its owner Erik Ortega, and BTG employee Martha Ortega. Some of Garcia's claims are based on Industrial Welfare Commission (IWC) wage orders;[1] others are not. The trial court granted defendants' motion for summary judgment on all eight causes of action on the basis that Garcia was an independent contractor, not an employee. After Garcia's appeal was fully briefed, the Supreme Court issued a ruling in *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903 (*Dynamex*), clarifying the employee-independent contractor question as to wage order claims.

As we explain, *Dynamex* compels the conclusion that defendants did not meet their burden on summary judgment to show no triable issue of material fact as to Garcia's *wage order* claims. Under part C of the "ABC" test adopted in *Dynamex*, defendants had to demonstrate that Garcia "*is* customarily engaged in an independently established trade, occupation, or business" apart from his work for BTG, not that he was merely *capable* of such engagement. (*Dynamex, supra,* 4 Cal.5th at p. 963, italics added.) We reach a different result as to the *non-wage-order* claims, to which *Dynamex* does not apply. As to those claims discussed in the nonpublished portion of our opinion, Garcia forfeited appellate review of the trial court's decision that he was not an employee under the

---

[1] At issue in *Dynamex* and this case is Wage Order No. 9, which applies to "all persons employed in the transportation industry." (Cal. Code Regs., tit. 8, § 11090, subd. 1.) We discuss state wage orders in greater detail in the discussion.

standard articulated in *S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341 (*Borello*).

Accordingly, we reverse the judgment and remand with instructions to enter a new order denying summary adjudication of the wage order causes of action and granting summary adjudication as to the non-wage-order causes of action.

FACTUAL AND PROCEDURAL BACKGROUND[2]

The City of Calexico regulates the local taxicab industry. (Calexico Mun. Code, ch. 5.80.) To operate a taxi service, a person or business must obtain a "certificate of public convenience and necessity" from the city council, which considers public demand for additional taxi service and other factors. (Calexico Mun. Code, ch. 5.80, §§ 5.80.020, 5.80.050.) Each certificate in turn authorizes a certain number of vehicle permits. (*Id.*, § 5.80.020.)[3] City authorities set rates, approve taxi color schemes and markings, and inspect vehicles. (*Id.*, §§ 5.80.250, 5.80.270, 5.80.320.)

---

[2]  "The pleadings define the issues to be considered on a motion for summary judgment. [Citation.] As to each claim as framed by the complaint, the defendant must present facts to negate an essential element or to establish a defense." (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 252.) Garcia's complaint omits key factual allegations as to when he started working for BTG and the factual premise for his wage and hour claims. The trial court was right in stating it consists of mere "legal conclusions." Because defendants requested summary judgment, not judgment on the pleadings or demurrer, defects in the complaint are not before us. We draw relevant facts in this section from the parties' summary judgment papers *solely* to provide context for our analysis.

[3]  In other locales, taxi vehicle permits are sometimes called "medallions." (See, e.g., *Sebago v. Boston Cab Dispatch, Inc.* (Mass. 2015) 28 N.E.2d 1139, 1143 (*Sebago*).)

3

The Municipal Code contemplates different business models for taxicab service. A driver can "operate[] any taxicab or vehicle for hire as an employee," or he can "independently contract[] with [a vehicle permit] owner to operate the taxicab or vehicle for hire pursuant to a lease, license, or any other form of agreement." (Calexico Mun. Code, ch. 5.80, § 5.80.010.) To operate a taxi, drivers must obtain a driver's permit from the city. (*Id.*, § 5.80.110.) The driver's permit "may be used by the driver only while employed by a specified taxi company." (*Id.*, § 5.80.140.) If the driver starts working for a different vehicle permit owner, an updated permit is required. (*Id.*, § 5.80.160.)

In July 2008, Erik Ortega purchased assets from the bankruptcy estates of his parents, Jose Ortega (Case No. 06-03848-LA11) and Martha Elba Ortega (Case No. 06-03849-LA11). He bought 11 vehicles with a red color scheme labeled Border Cab, and 14 vehicles with a white color scheme labeled Calexico Taxi. From the mid-1980's to 2008, Jose Ortega was the sole proprietor and owner of Border Cab, and Martha Ortega was the sole proprietor and owner of Calexico Taxi. On January 1, 2009, Erik formed BTG as a limited liability corporation and employed Martha.[4]

BTG owned 30 out of 45 total vehicle permits issued by the City of Calexico. It owned 15 permits for vehicles with a white color scheme marked "Calexico Taxi," and 15 permits for vehicles with a red color scheme marked "Border Cab." The remaining 15 vehicle permits were owned by a different entity, for vehicles marked "California Cab." Erik had no ownership interest in California Cab.

---

4    Because they share a last name, we refer to Erik Ortega and Martha Ortega by their first names and intend no disrespect.

4

Garcia worked as a driver for BTG. He bought a 1998 Ford Crown Victoria around December 2008. The vehicle had a white color scheme and was marked "Calexico Taxi." He operated that vehicle as a taxi-for-hire from January 2009 to August 2013. This required him to lease a vehicle permit from BTG for about $520 per week; he also signed up for optional radio dispatch service costing $350 per month. A January 2009 lease and February 2012 revised lease labeled Garcia as an independent contractor and disavowed any employment relationship.

The engine of Garcia's Crown Victoria failed in August 2013. Thereafter, he started leasing a vehicle from BTG for $65 per 12-hour shift, on top of existing vehicle permit and radio dispatch fees. Garcia stopped working for BTG in April 2014, following an incident in which he was required to pay an additional $65 shift charge for returning a leased vehicle an hour late. Thereafter, Garcia claims, he was prevented from renewing his lease; defendants maintain he elected not to renew it.

In 2015, Garcia sued defendants for various wage and hour violations occurring between 2010 and 2014.[5] The complaint asserts eight causes of action:

> 1. <u>Wrongful termination in violation of public policy</u>. (Lab. Code, §§ 923 [employees may organize], 6310 [retaliation for an OSHA complaint], 6400 [duty to provide a safe work environment], 1102.5 [whistleblower protection].)

---

[5] There are just two factual allegations in the complaint—Garcia left BTG in April 2014, and his claims accrued "[o]ver the past four years." It is not clear whether this means four years before Garcia filed his complaint or four years before he *left* BTG. Generously construed, on summary judgment Garcia's wage order claims are limited to the April 2010 to April 2014 period. Accordingly, we need not address defendants' contention, raised below and on appeal, that any claims preceding January 1, 2009, were discharged in bankruptcy proceedings.

5

2. Unpaid wages under the wage order. (Cal. Code Regs, tit. 8, § 11090.)

3. Failure to pay minimum wage. (Lab. Code, §§ 1182.12 [minimum wage], 1194 [right of action], 1194.2 [liquidated damages], 1197 [duty to pay minimum wage].)

4. Failure to pay overtime. (Lab. Code, §§ 510 [overtime], 1194 [right of action].)

5. Failure to provide meal and rest breaks. (Lab. Code, §§ 226.7 [rest periods], 512 [meal breaks].)

6. Failure to furnish accurate wage statements. (Lab. Code, §§ 226 [wage statements], 226.3 [civil penalties], 2699 [PAGA penalties].)

7. Waiting time penalties. (Lab. Code, §§ 201−202 [wages and leave due upon departure], 203 [penalties].)

8. Unfair competition (UCL), based on the foregoing violations. (Bus. & Prof. Code, § 17200 et seq.; Lab. Code, § 2699 [PAGA penalties].)

Defendants moved for summary judgment. Relying on *Borello, supra,* 48 Cal.3d 341, they argued all eight causes of action failed because Garcia was an independent contractor, not an employee. Erik's declaration established various ways in which BTG did not exercise control over drivers. Garcia and others remained free to set their hours, use the car for personal errands, decline the optional radio dispatch service, keep their collected fares, enter into sublease agreements, hold other jobs, advertise services in their own names, etc.

6

Based on defendants' moving papers,[6] the trial court agreed that Garcia was an independent contractor. It granted summary judgment, explaining:

> "The evidence in this case is that there was a lease between -- lease of the taxicab license to the plaintiff as an individual. The lease itself is clear that there was no employer/employee relationship. It directly disclaims that. The evidence of how the arrangement was carried out is consistent with the lease. It does not appear that Border Transport exercised any control over plaintiff's activities that would implicate an employee/employer relationship. For example, there was no evidence that they provided any instruction on operation of the vehicle. There was no sort of employee handbook.

> "Border Transport did not dictate plaintiff's rates or require plaintiff to maintain trip sheets. Plaintiff operated his own vehicle, a Crown Victoria. Border Transport did not get any part of the fares. They did not dictate the geographical area. They did not dictate a shift or a schedule. They did not require plaintiff to record his whereabouts. They did not require him to respond to dispatch. They did not require him to turn on the optional radio. They did not dictate when or how often he took breaks. They had no control when he also used his vehicle for personal use. He could and did market his taxicab business in his own name. He was free to use his own cell phone, business phone, or other items. And he could elect not to renew his vehicle lease permit at any time."

## DISCUSSION

Garcia contends the trial court erred in denying his request to continue the summary judgment hearing and in refusing to consider the separate statement and other documents filed the day of that hearing. Reviewing these claims for abuse of discretion we find no error.

---

[6] To avoid repetition, we discuss facts pertinent to the court's denial of Garcia's continuance request and its exclusion of his late-filed separate statement in nonpublished portions of the discussion section.

7

Turning to the merits, we review the summary judgment ruling de novo, "considering all of the evidence the parties offered in connection with the motion (except that which the trial court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) Summary judgment is proper if the record demonstrates there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c);[7] *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) Because we review the ruling and not its rationale, we affirm an order granting summary judgment "if it is correct on any ground that the parties had an adequate opportunity to address in the trial court, regardless of the trial court's stated reasons." (*Securitas Security Services USA, Inc. v. Superior Court* (2011) 197 Cal.App.4th 115, 120.)

After briefing on Garcia's appeal was complete, the Supreme Court decided *Dynamex, supra,* 4 Cal.5th 903, which addresses the employee-independent contractor question as to wage order claims (described *post*). We invited the parties to brief the impact of that case, if any, on the issues in this appeal. In his supplemental brief, Garcia argues that *Dynamex* demonstrates he was an employee. Defendants argue that even under *Dynamex*, Garcia was an independent contractor. They note that the Supreme Court adopted the Massachusetts formulation of the ABC test, and *Sebago, supra,* 28 N.E.2d 1139 applied that test to find that taxicab lessees were independent contractors.

---

7    Further statutory references are to the Code of Civil Procedure unless otherwise indicated.

8

As we explain, summary adjudication was erroneous as to the wage order claims but proper as to the non-wage-order claims. As to the former, defendants did not meet their burden to show that Garcia "is customarily engaged in an independently established trade, occupation, or business." (*Dynamex, supra,* 4 Cal.5th at p. 963.) As to the latter, Garcia forfeited review.

1.    *The court did not abuse its discretion in denying Garcia's request for a continuance or in rejecting documents filed the day of the motion hearing.*

    a.    *Additional background*

Defendants filed their summary judgment motion on January 6, 2017. Garcia's original opposition deadline was March 13, 14 days before the hearing. (§ 437c, subd. (b)(2).) After the hearing was continued to April 4, the new deadline was March 21. (*Ibid.*)

On March 6, defendants filed an ex parte motion noting that the continued April 4 hearing date fell within 30 days of the trial date, in violation of section 437c, subdivision (a)(3). Both sides appeared at the March 8 hearing on defendants' ex parte motion, where the court continued trial to July 2017. Garcia did not request a continuance of the summary judgment hearing at that hearing.

On March 9, Garcia's counsel deposed Martha and Erik. Garcia missed the March 21 deadline to file an opposition to the summary judgment motion. On March 24, he filed an ex parte request to continue the summary judgment hearing, claiming he needed the transcripts from the March 9 depositions to oppose defendants' motion. The court set an April 3 hearing on Garcia's continuance request.

9

Garcia filed his first set of summary judgment opposition papers on March 27. This first set contained a brief and declarations from Garcia and two other drivers. It omitted the requisite separate statement. (§ 437c, subd. (b)(3).)

Meanwhile, defendants opposed Garcia's continuance request, arguing it was untimely and lacked good cause. On April 3, Garcia failed to appear for the scheduled hearing on his continuance motion.

On April 4, the date of the summary judgment hearing, Garcia filed a second set of opposition papers. This set included excerpts from Erik's and Martha's depositions and a separate statement. It also included a declaration from Garcia's counsel stating a continuance was warranted because he did not receive transcripts from the March 9 depositions until March 27 and had unspecified "illness staff issues during that time."

The court addressed the continuance issue and the late-filed documents at the summary judgment hearing. It refused to accept the papers filed that day, finding them "more than late under any standards." It likewise denied the continuance request, noting: (1) Garcia effectively received two extra weeks from his original deadline and had sufficient time to oppose the motion; (2) there was nothing in the documents filed that day suggesting additional discovery was essential; and (3) Garcia failed to appear for the hearing on his continuance request.

Garcia challenges these rulings on appeal. As to the continuance request, he claims he was "treated unfairly and unequally" when the court granted defendants' request to continue the trial date but denied his similar request. He suggests he was

10

entitled to a continuance under section 437c, subdivision (h).[8]  As to the evidentiary ruling, he argues the court abused its discretion by refusing to consider documents supporting his opposition.

  b.  *Continuance motion*

  "In seeking a continuance of a summary judgment motion, a plaintiff has essentially two options." (*Hamilton v. Orange County Sheriff's Dept.* (2017) 8 Cal.App.5th 759, 764 (*Hamilton*).)  The first is to comply with section 437c, subdivision (h). (*Hamilton,* at pp. 764–765.)  Garcia did not do so because he filed his ex parte continuance request three days *after* his opposition brief was due.  (See § 437c, subd. (h) [request must be made on or *before* opposition deadline].)

  "Where a plaintiff cannot make the showing required under section 437c, subdivision (h), a plaintiff may seek a continuance under the ordinary discretionary standard applied to requests for a continuance." (*Hamilton, supra,* 8 Cal.App.5th at p. 765.)  "This requires a showing of good cause" based on various factors, including " '(1) how long the case has been pending; (2) how long the requesting party had to oppose the motion; (3) whether the continuance motion could have been made earlier; (4) the proximity of the trial date or the 30-day discovery cutoff before trial; (5) any prior

---

[8]  Section 437c, subdivision (h) provides: "If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication, or both, that facts essential to justify opposition may exist but cannot, for reasons stated, be presented, the court shall deny the motion, order a continuance to permit affidavits to be obtained or discovery to be had, or may make any other order as may be just.  The application to continue the motion to obtain necessary discovery may also be made by ex parte motion at any time on or before the date the opposition response to the motion is due."

continuances for the same reason; and (6) the question whether the evidence sought is truly essential to the motion.' " (*Ibid.*)

Here, the court reasonably found no "good cause" for a continuance. Garcia filed the action in October 2015 and did not notice the depositions of Erik or Martha until January 20, 2017, two weeks after the summary judgment motion was filed. Garcia could have requested a continuance earlier, including at the March 8 hearing on defendants' ex parte motion. And Garcia failed to appear at the hearing on his own continuance motion. Garcia had two extra weeks by virtue of rescheduling and his own delay to file his initial opposition. The court reasonably found that there "was plenty of time to get ready."

These factors alone would support affirmance. But having reviewed excerpts of the March 9 depositions, we conclude the trial court reasonably found that nothing in them would help Garcia oppose the motion. Consistent with his declaration, Erik testified that BTG did not exercise control over its drivers. Martha explained her role as supervisor was limited to collecting payments from Garcia and other drivers; she denied scolding or reprimanding Garcia. This evidence was already in the record and did not help Garcia show a triable issue of fact. The court reasonably found that the evidence sought was not " 'truly essential to the motion.' " (*Hamilton, supra,* 8 Cal.App.5th at p. 765.)

To the extent Garcia makes an equity argument, it is unfounded. Defendants filed a motion to alert the court that the rescheduled summary judgment hearing date fell within 30 days of the trial date. It offered three different options—move up the hearing,

12

continue the trial, or keep both dates as scheduled for good cause. The court's decision to continue the trial date is irrelevant to its ruling that there was no good cause to continue the summary judgment hearing.

In sum, the court did not abuse its discretion in denying Garcia's continuance request.

c. *Exclusion of evidence*

We need not dwell on Garcia's second point. Section 437c, subdivision (b)(2) requires opposition papers to be filed and served 14 days before the hearing, unless the court orders otherwise for good cause. "A trial court has broad discretion under rule 3.1300(d) of the California Rules of Court to refuse to consider papers served and filed beyond the deadline without a prior court order finding good cause for late submission." (*Bozzi v. Nordstrom, Inc*. (2010) 186 Cal.App.4th 755, 765 (*Bozzi*).)

Garcia filed his first set of opposition papers almost a week late. His second set of opposition papers was even later, filed the same day as the summary judgment hearing. Garcia did not show good cause permitting him to file either set of late papers—as noted, nothing in the deposition transcripts cited as a reason for delay helped Garcia's case. The court reasonably excluded the documents filed on April 4 as "more than late under any standards." (*G.E. Hetrick & Associates, Inc. v. Summit Construction & Maintenance Co.* (1992) 11 Cal.App.4th 318, 325 [no error in excluding declaration filed the day of the summary judgment hearing]; *Bozzi, supra,* 186 Cal.App.4th at p. 765 [same].)

Garcia's failure to file a separate statement with his original opposition papers is consequential. Failure to file a separate statement in opposition to a summary judgment

13

motion "may constitute a sufficient ground, in the court's discretion, for granting the motion." (§ 437c, subd. (b)(3); *Oldcastle Prescast, Inc. v. Lumbermens Mutual Casualty Co.* (2009) 170 Cal.App.4th 554, 568.) The trial court exercised its discretion along these lines, partly basing its decision on Garcia's failure to timely file a separate statement. Because there was no abuse of discretion in excluding Garcia's April 4 filing, our review on appeal is limited to whether defendants' moving papers *alone* show the lack of a triable issue.

2.     *Legal Framework: Distinguishing "Employees" from "Independent Contractors"*

As recognized by the California Supreme Court in *Dynamex*, under both state and federal law "the question whether an individual worker should properly be classified as an employee or, instead, as an independent contractor has considerable significance for workers, businesses, and the public generally." (*Dynamex, supra,* 4 Cal.5th at pp. 912, 913.) "Employees are shielded by antidiscrimination laws, wage and hour laws, and family and medical leave protections; independent contractors are not. Employees can access federal and state programs, including unemployment insurance and worker's compensation; independent contractors cannot. In turn, employers are subject to liability and tax and benefit contribution requirements under these laws only for their employees." (Deknatel & Hoff-Downing, *ABC on the Books and in the Courts: An Analysis of Recent Independent Contractor and Misclassification Statutes* (2015) 18 U.Pa.J.L. & Soc. Change 53; see *Dynamex,* at p. 950, fn. 20 [citing article].) Given the potential economic incentives a business might have to avoid legal obligations, the risk of misclassifying employees as independent contractors is significant. (*Dynamex,* at p. 913.)

14

*Dynamex* is the latest effort by the Supreme Court to address the employee-independent contractor distinction, at least in the wage order context. To understand its application to this case, we briefly discuss the broad legal framework.

At common law, the distinction between employees and independent contractors arose in the tort context, in defining a principal's vicarious liability for an agent's conduct. (*Borello, supra,* 48 Cal.3d at p. 350; *Dynamex, supra,* 4 Cal.5th at p. 927.) But owing to their distinct policies, "the concept of 'employment' embodied in [social welfare legislation] is not inherently limited by common law principles." (*Borello*, at p. 351.) In what has come to be viewed as "the seminal California decision on this subject" (*Dynamex,* at p. 929), the Supreme Court in *Borello* defined a general approach to determine whether a worker is an employee or an independent contractor.

The question in *Borello* was whether cucumber pickers were employees of an agricultural grower for purposes of workers' compensation. Drawing from the common law, the court explained that " '[t]he principal test of an employment relationship is whether the person to whom the service is rendered has the right to control the manner and means of accomplishing the result desired. . . .' " (*Borello, supra,* 48 Cal.3d at p. 350.) The right to discharge at will without cause is strong evidence of an employment relationship. (*Ibid.*)

But apart from "control," *Borello* also identified several " 'secondary indicia' " that bear on employment status, principally drawn from the Restatement Second of Agency. (*Borello, supra*, 48 Cal.3d at pp. 350–351.) These include:

"(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (*Id.* at p. 351.)

*Borello* cautioned that individual factors are intertwined and cannot be mechanically applied. (*Ibid.*) "Each service arrangement must be evaluated on its facts, and the dispositive circumstances may vary from case to case." (*Id.* at p. 354.) Although it can be considered, "[t]he label placed by the parties on their relationship is not dispositive." (*Id.* at p. 349.)

Applied to the facts before it, the *Borello* court concluded the cucumber pickers were employees. They formed "a regular and integrated portion of [the grower]'s business operation" in which the grower did everything from deciding what to plant to distributing the picked produce to various markets. (*Borello, supra,* 48 Cal.3d at p. 357.) Rejecting the grower's claim that the workers had complete control over how they did their work and were compensated based on the amount of cucumbers picked, the court reasoned that the grower had "all *necessary* control over the harvest portion of its operations." (*Id.* at pp. 356–357.) In no practical sense could the workers be deemed "entrepreneurs operating independent businesses for their own accounts." (*Id.* at p. 345.) The court cautioned that "[a] business entity may not avoid its statutory obligations by

16

carving up its production process into minute steps, then asserting that it lacks 'control' over the exact means by which one such step is performed by the responsible workers." (*Id.* at p. 357.)

In approving the use of various " 'control' " factors, however, *Borello* emphasized that whether a worker is an employee must be decided "with deference to the purposes of the protective legislation." (*Borello, supra,* 48 Cal.3d at p. 353.) A court's job is to parse the "nature of the work, and the overall arrangement between the parties" and decide "whether they come within the 'history and fundamental purposes' of the statute." (*Id.* at pp. 353−354.) In this case, as we explain, the IWC's Wage Order No. 9 defines the scope of the employment relationship as to some of Garcia's claims.

The IWC promulgates "constitutionally authorized, quasi-legislative regulations" that "impose obligations relating to the minimum wages, maximum hours, and a limited number of very basic working conditions (such as minimally required meal and rest breaks) of California employees" in various industries. (*Dynamex, supra,* 4 Cal.5th at pp. 913−914 & fn. 3.) We focus on the applicable version of Wage Order No. 9, which regulates minimum working conditions for "employees" in the transportation industry. (Cal. Code Regs., tit. 8, § 11090.)[9]

---

[9] "The definitions of 'employ,' 'employee,' and 'employer' that appear in subdivision 2 of the transportation industry wage order are also included in the definitions set forth in each of the other 15 wage orders governing other industries in California, although several of the other industry wage orders include additional definitions of the term 'employee.' " (*Dynamex, supra,* 4 Cal.5th at p. 926, fn. 9.)

17

In *Martinez v. Combs* (2010) 49 Cal.4th 35, 64, the Supreme Court looked to the definitions contained within wage orders and held that wage orders encompass three alternative definitions of "employ." Under the broadest (relevant here) " '[e]mploy' " means to "suffer, or permit to work." (Cal. Code Regs., tit. 8, § 11090, subd. 2(D); *Martinez,* at pp. 57–58.) This definition derives from child labor laws, which sought to extend beyond the common law master-servant relationship and target "the defendant's failure to exercise reasonable care to prevent child labor from occurring." (*Martinez,* at p. 58.) Applied to modern-day wage and hour claims, "[a] proprietor who knows that persons are working in his or her business without having been formally hired, or while being paid less than the minimum wage, clearly suffers or permits that work by failing to prevent it, while having the power to do so." (*Id.* at p. 69.)

Recently, the Supreme Court addressed whether the wage order definitions of " 'employ' " as construed in *Martinez* applied to certify a class in a wage and hour lawsuit. (*Dynamex, supra,* 4 Cal.5th at p. 942.) The delivery drivers sued Dynamex for overtime, reimbursement of business expenses, and other claims, alleging they had been misclassified as independent contractors. (*Ibid.*) As the Supreme Court explained, the trial court properly applied the "suffer or permit to work" definition of employment in *Martinez,* instead of the "control" test in *Borello*, to evaluate class certification for *wage order* claims. (*Id.* at pp. 944–945, 950.)[10] The "suffer or permit to work" definition fit the broad remedial purpose of wage orders to protect workers, shield law-abiding

---

[10] The court did not address what standard applies to *non*-wage-order claims. (*Dynamex, supra,* 4 Cal.5th at pp. 916, fn. 5 & 925.)

18

businesses from unfair competition, and prevent shifting the costs of ill effects to workers to the public at large. (*Dynamex*, at pp. 952–953.)

Next, the *Dynamex* court considered what test applies to evaluate the employee-independent contractor question under the "suffer or permit to work" definition of "employ." Eschewing a multifactor standard, the court instead adopted the three-part "ABC" test used in many other jurisdictions to decide whether a worker is a covered employee or rather an independent contractor. (*Dynamex, supra,* 4 Cal.5th at pp. 956–957.) Unlike a multifactor test, the ABC test " 'allows courts to look beyond labels and evaluate whether workers are truly engaged in a separate business or whether the business is being used by the employer to evade wage, tax, and other obligations.' " (*Id.* at p. 958, fn. 26.)

Under the ABC test, a worker is presumed to be an employee, unless the hiring entity establishes *each* of the following:

> "(A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed." (*Dynamex, supra,* 4 Cal.5th at p. 957.)

Part A involves *Borello*'s common law "control" test, recognizing that "a business need not control the precise manner or details of the work in order to be found to have maintained the necessary control" for an employer-employee relationship. (*Dynamex,*

*supra,* 4 Cal.5th at p. 958; see also *id.* at p. 950, fn. 20 [key question under *Borello* is "whether the hiring entity has retained '*necessary* control' over the work"].)

Part B asks whether the worker can reasonably be viewed as working in the hiring entity's business. (*Dynamex, supra,* 4 Cal.5th at p. 959.) This inquiry turns on whether the worker is "reasonably viewed as providing services to the business in a role comparable to that of an employee, rather than in a role comparable to that of a traditional independent contractor." (*Ibid.*) A plumber hired by a retail store would not be considered an employee; by contrast, a cake decorator servicing a bakery for custom cakes, or an at-home seamstress sewing dresses from patterns supplied by a clothing manufacturer, would. (*Id.* at pp. 959−960.)

Part C asks whether the worker "*independently* has made the decision to go into business for himself or herself." (*Dynamex, supra,* 4 Cal.5th at p. 962.) This factor can be proven with evidence that the worker has "take[n] the usual steps to establish and promote his or her independent business—for example, through incorporation, licensure, advertisements, routine offerings to provide the services of the independent business to the public or to a number of potential customers, and the like." (*Ibid.*) Critically, as we will discuss, this part requires that the worker *is engaged* in an independent business, not that he or she *could have* become so engaged. (*Id.* at p. 962 & fn. 30.)

Because "a hiring entity's failure to satisfy any one of the three parts itself establishes that the worker should be treated as an employee for purposes of the wage order, a court is free to consider the separate parts of the ABC standard in whatever order it chooses." (*Dynamex, supra,* 4 Cal.5th at p. 963.)

20

Returning to our case, defendants relied on *Borello* in moving for summary judgment. The trial court likewise relied on *Borello*'s "control" factors to find Garcia was an independent contractor. In so doing, it implicitly rejected Garcia's reliance on *Yellow Cab Cooperative, Inc. v. Workers' Comp. Appeals Bd.* (1991) 226 Cal.App.3d 1288 (*Yellow Cab*), which applied *Borello* to conclude that a taxi lessee was an employee because the cab company exercised control over the lessee's performance *as a driver*. The question we must address is whether *Dynamex* applies to none, some, or all of Garcia's claims and, to the extent it applies, whether defendants met their burden to show the lack of a triable issue as to Garcia's employment status.

3.      *Dynamex only applies to Garcia's wage-order claims.*

"*Dynamex* did not purport to replace the *Borello* standard in every instance where a worker must be classified as either an independent contractor or an employee for purposes of enforcing California's labor protections." (*California Trucking Assn. v. Su* (9th Cir. 2018) 903 F.3d 953, 959, fn. 4.) To the contrary, the Supreme Court recognized that different standards could apply to different statutory claims:

> "[B]ecause the *Borello* standard itself emphasizes the primacy of statutory purpose in resolving the employee or independent contractor question, when different statutory schemes have been enacted for different purposes, it is possible under *Borello* that a worker may properly be considered an employee with reference to one statute but not another." (*Dynamex, supra*, 4 Cal.5th at p. 948.)

*Dynamex* applied the "suffer or permit to work" standard contained in the wage order without deciding what standard applied to *non*-wage-order claims, such as claims for reimbursement of fuel or tolls under Labor Code, section 2802. (*Dynamex, supra*, 4

21

Cal.5th at p. 942.)  It did not reject *Borello*, which articulated a multifactor test for determining employment status under the Worker's Compensation Act.  Nor did it address the appellate court's ruling that "insofar as the causes of action in the complaint . . . are not governed by the wage order" and predicated solely on the Labor Code, "the *Borello* standard is the applicable standard for determining whether a worker is properly considered an employee or an independent contractor."  (*Dynamex,* at p. 915.)

We follow the approach of the Court of Appeal in *Dynamex*.  It is logical to apply the "suffer or permit to work" standard (and the ABC test that explicates it) to wage order claims.  First, the wage order explicitly defines "employ" in this language, and the case law emphasizes "the primacy of statutory purpose in resolving the employee or independent contractor question."  (*Dynamex, supra*, 4 Cal.5th at p. 948.)  Second, wage orders regulate very *basic* working conditions for covered California employees, thus warranting " 'the broadest definition' " of employment to extend protections to "the widest class of workers."  (See *id.* at pp. 913, 951; Cal. Code Regs., tit. 8, § 11090, subd. 1.)  There is no reason to apply the ABC test categorically to every working relationship, particularly when *Borello* appears to remain the standard for worker's compensation.  Although both parties suggest *Dynamex* has some application to Garcia's case, neither identifies a basis to apply *Dynamex* to non-wage-order claims.  We conclude *Borello* furnishes the proper standard as to those claims.

Of the eight causes of action alleged in Garcia's complaint, five arise under the wage order:  unpaid wages, failure to pay minimum wage (which may overlap), failure to provide meal and rest periods, failure to furnish itemized wage statements, and UCL

22

claims based on the foregoing. These claims are governed by the "suffer or permit to work" standard described in *Dynamex*.

Garcia's remaining causes of action do not arise under the wage order. The wage order's overtime regulations do not apply to taxicab drivers. (Cal. Code Regs., tit. 8, § 11090, subd. 3(M).) Likewise, the wage order does not encompass claims for wrongful termination in violation of public policy or waiting time penalties. Accordingly, Garcia's claims for overtime, wrongful termination, waiting time penalties, and UCL claims resting on the foregoing are governed by the common law test articulated in *Borello*.

4.      *Dynamex compels reversal as to the wage order claims.*

*Dynamex* changed the appropriate standard for determining whether Garcia was an employee entitled to wage order protection, or an independent contractor who was not.[11]

---

[11]      Generally, "judicial decisions are given retroactive effect." (*Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978 (*Newman*).) But the rule of retroactivity is not "absolute." (*Ibid.*) "A court may decline to follow the standard rule when retroactive application of a decision would raise substantial concerns about the effects of the new rule on the general administration of justice, or would unfairly undermine the reasonable reliance of parties on the previously existing state of the law." (*Id.* at p. 983.) In their supplemental brief discussing the impact of *Dynamex*, defendants implicitly assume retroactivity, and we therefore do not address that issue today. (*In re Retirement Cases* (2003) 110 Cal.App.4th 426, 443 [party arguing nonretroactivity bears the burden of proof].)

          As an academic point, we observe that *Dynamex* applied the ABC test to the class certification question before it, and the Supreme Court denied later requests to modify the opinion to apply the ABC test only prospectively. Moreover, to the extent *Dynamex* merely extended principles stated in *Borello* and *Martinez*, it represented "no greater 'surprise' " than tort decisions that routinely apply retroactively. (*Newman, supra,* 48 Cal.3d at p. 984; see *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 25 [rejecting argument that judicial decision was "unforeseeable," precluding retroactive application, where it "was but a logical extension" of previously established principles].)

23

As to his wage order claims, we conclude there is a triable issue as to whether Garcia was an employee under the now-applicable ABC test.

The ABC test "*presumes* a worker hired by an entity is an employee and places the burden on the hirer to establish that the worker is an independent contractor" by showing each of parts A, B, and C. (*Dynamex, supra,* 4 Cal.5th at p. 950, fn. 20, italics added.) The failure to establish any one prerequisite is sufficient "to establish that the worker is an included employee, rather than an excluded independent contractor, for purposes of the wage order." (*Id.* at p. 964.) We focus our analysis on part C.

"[I]n order to satisfy part C of the ABC test, the hiring entity must prove that the worker is customarily engaged in an independently established trade, occupation, or business." (*Dynamex, supra,* 4 Cal.5th at p. 963.) "When a worker has not independently decided to engage in an independently established business but instead is simply designated an independent contractor by the unilateral action of a hiring entity, there is a substantial risk that the hiring business is attempting to evade the demands of an applicable wage order through misclassification." (*Id.* at p. 962.)

Key for our purposes, *Dynamex* makes clear that the question in part C is *not* whether BTG *prohibited* or *prevented* Garcia from engaging in an independently established business. (*Dynamex, supra,* 4 Cal.5th at p. 962 ["[t]he fact that a company has not prohibited or prevented a worker from engaging in such a business is not sufficient"].) Instead, the inquiry is whether Garcia fits the common conception of an independent contractor—"an individual who *independently* has made the decision to go into business for himself or herself" and "generally takes the usual steps to establish and

24

promote his or her independent business—for example, through incorporation, licensure, advertisements, routine offerings to provide services of the independent business to the public or to a number of potential customers, and the like." (*Ibid.*)

*Dynamex* drives this point home in footnote 30. The court cites with approval a Utah case that explained, " 'the appropriate inquiry under part (C) is whether the person engaged in covered employment actually has such an independent business, occupation, or profession, not whether he or she could have one.' " (*Dynamex, supra,* 4 Cal.5th at p. 962, fn. 30, citing *McGuire v. Dept. of Employment Security* (Utah Ct.App. 1989) 768 P.2d 985, 988.) It also references a Vermont decision construing language identical to that in part C as follows:

> " 'The adverb "independently" clearly modifies the word
> "established," and must carry the meaning that the trade, occupation,
> profession or business was established, independently of the
> employer or the rendering of the personal service forming the basis
> of the claim. The present tense 'is' indicates the individual must be
> engaged in such independent activity at the time of rendering the
> service involved. "Customarily" means usually, habitually,
> regularly.' " (*In re Bargain Busters, Inc.* (Vt. 1972) 287 A.2d 554,
> 559 [cited by *Dynamex,* at p. 962, fn. 30].)

A North Dakota case cited in footnote 30 likewise explains that "to meet the third prong, it is not enough to show that the individuals are free to engage in similar activities for others or work as employees for others." (*Midwest Property Recovery, Inc. v. Job Service of North Dakota* (N.D. 1991) 475 N.W.2d 918, 924.) Finally, footnote 30 cites a Connecticut decision that explains it is not enough for a hiring business to *permit* a worker to engage in activities for other businesses to satisfy part C. (*Dynamex,* at p. 962,

25

fn. 30, citing *JSF Promotions, Inc. v. Administrator* (2003) 828 A.2d 609, 613 (*JSF Promotions*).)

In their supplemental brief, defendants cite a 2015 Massachusetts Supreme Court case (*Sebago, supra,* 28 N.E.3d 1139) to argue that on similar facts defendants met their burden to prove part C. *Sebago* concluded that Boston taxi drivers who leased medallions from owners were " 'customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.' " (*Id.* at pp. 1152−1153.) But it defined the "critical inquiry" as "whether 'the worker is *capable* of performing the service to anyone wishing to avail themselves of the services or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services.' " (*Id.* at p. 1153.) An earlier Massachusetts case applied the same rubric in part C to conclude Cape Cod taxi drivers were independent contractors. (*Comm. of Div. of Unemployment Assistance v. Town Taxi of Cape Code, Inc*. (Mass.App.Ct. 2007) 862 N.E.2d 430, 431.)

The Massachusetts test is simply *not* the formulation of part C articulated in *Dynamex*. Defendants are correct that the wording of the ABC test adopted in *Dynamex* tracks a Massachusetts statute. (*Dynamex, supra,* 4 Cal.5th at p. 956, fn. 23.) The Supreme Court explained that it followed Massachusetts in omitting certain language from part *B* of the ABC test given "contemporary work practices[] in which many employees telecommute." (*Ibid.*) Notwithstanding this parallel, *Dynamex* makes clear that California follows the version of *part C* that requires an existing, not potential, showing of independent business operation. (*Id.* at p. 962, fn. 30.) Had the *Dynamex*

26

court viewed *Sebago* as persuasive in this particular context, one would expect it to be cited in footnote 30, which only makes its absence more significant.

In a recent decision, the Connecticut Supreme Court acknowledged the split in how courts construe part C. (*Kirby of Norwich v. Administrator, Unemployment Compensation Act* (Conn. 2018) 176 A.3d 1180 (*Kirby*).) *Kirby* noted that in Massachusetts, courts ask whether "the putative employee is *free* to engage in an independently established occupation, even if the putative employee does not actually do so." (*Id.* at p. 1191.) But it declined to follow the Massachusetts formulation based on *JSF Promotions, supra,* 828 A.2d at page 613. (*Kirby,* at p. 1191.) As it explained:

> "Any worker who provides services to a business necessarily has a 'trade, occupation, profession or business' that the worker would be free to engage in at some point for another similar entity after his relationship with the business has terminated. If evidence that the worker is actually performing those services for another entity during its relationship with the putative employer were not required, part C would be rendered meaningless." (*Id.* at pp. 1191–1192.)

Because *Dynamex* favorably cites *JSF Promotions* to define part C, we follow the *Kirby* approach and reject *Sebago*'s alternative construction.

Turning to the record in our case, pursuant to municipal regulations Garcia obtained a driver's permit that was "limited such that it may be used by the driver only while employed by a specified taxi company." (Calexico Mun. Code, ch. 5.80, § 5.80.140.) If Garcia were to switch companies, he would need a new permit bearing the new company's name. (*Id.*, § 5.80.160.) Accordingly, there is at best limited evidence he was even *capable* of providing services to a different taxi company under the *Sebago* framework. With BTG owning 30 of 45 available taxi permits, and municipal

27

regulations conditioning issuance of new permits on public demand for additional service, the facts of this case differ from *Sebago*, which involved drivers in metropolitan Boston who could "lease taxicabs and medallions from whomever they wish" on a day-to-day basis. (*Sebago, supra,* 28 N.E.3d at p. 1153; Calexico Mun. Code, ch. 5.80, § 5.80.050(A).) Even if the *Sebago* framework applied, the nature of the business arguably compels Garcia "to depend on a single employer for the continuation of [his] services." (*Sebago,* at p. 1153.)

Under the more stringent part C framework adopted by the California Supreme Court in *Dynamex*, the result is obvious. *Dynamex* requires more than mere capability to engage in an independent business. Defendants presented no evidence in their moving papers that Garcia in fact provided services for other entities "independently" of his relationship with BTG. Defendants do not suggest otherwise; they simply rely on the *Sebago* formulation and suggest Garcia was "free to offer his services as an entrepreneur to anyone he chose."

Because defendants did not meet their burden to establish part C, summary adjudication is inappropriate for Garcia's wage order claims. The moving papers did not establish that Garcia "is customarily engaged in an independently established trade, occupation, or business." (*Dynamex, supra,* 4 Cal.5th at p. 963; see *Affordable Cabs, Inc. v. Department of Employment Sec.* (Wash.App. 2004) 101 P.3d 440, 445 [taxi driver was employee under part C because he had not "solicited, advertised, or otherwise held himself out to the community as being in a separate business"; had not "established himself as a separate business"; "did not own his taxi, records, or customer lists; have a

28

special business license; or have anything else indicative of an independent business";
and "could not continue his business after leaving ACI"].)

Accordingly, summary adjudication is improper as to the *wage order* claims—the second cause of action for unpaid wages, third cause of action for failure to pay minimum wage, fifth cause of action for failure to provide meal and rest breaks, sixth cause of action for failure to furnish itemized wage statements, and eighth cause of action for UCL claims related to the foregoing claims.

5.      *Garcia forfeited review as to his non-wage-order claims.*

The conclusion that the *Borello* test applies to Garcia's non-wage-order claims has significant implications for our review of the trial court's ruling with respect to those claims. The trial court applied the correct (*Borello*) legal standard. It concluded there was no triable issue as to whether Garcia was an employee. On appeal, Garcia cites the same two cases he cited below. (*Yellow Cab, supra,* 226 Cal.App.3d 1288 [taxi drivers were employees under *Borello*]; *Alexander v. FedEx Ground Package System, Inc.* (9th Cir. 2014) 765 F.3d 981, 988, 997 [delivery drivers were employees under *Borello*].) With no record citations, he claims there are parallels between this case and those two cases. He does not critique the trial court's reasoning that under the "control of details" test in *Borello*, Garcia was an independent contractor, not an employee.

Crucially, Garcia's argument fails as to the non-wage-order claims because he cites no admissible *evidence* to show how or why the court erred. His opening brief essentially relies on this string cite to the excluded separate statement:

29

> "To support its conclusions, Plaintiff in its Separate Statement disputed several of the facts Defendant[s'] relied upon, more specifically, Plaintiffs disputed facts, 2, 3, 4,5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34,35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50-73, 78 86, 89-125, 140, etc."

His supplemental brief fares no better, repeatedly citing the same excluded separate statement. Only *one* fact—that BTG furnishes liability insurance and accidental death/dismemberment coverage—was within the record before the trial court. The rhetorical question following it, that if drivers were independent contractors, "why then, would BTG pay for their liability insurance," does not amount to a developed argument on appeal.

Although we review a grant of summary judgment de novo, that does not relieve Garcia of the duty to demonstrate error or obligate us to cull the record in attempt to uncover a triable issue. (*Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 372.) Our "review is limited to issues adequately raised and supported in the appellant's brief." (*Christoff v. Union-Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125.) California Rules of Court, rule 8.204(a)(1)(B) and (C) require appellate briefs to support each point if possible "by citation of authority" and refer to record citations by volume and page number. "Where a point is merely asserted by appellant's counsel without any argument of or authority for the proposition, it is deemed to be without foundation and requires no discussion by the reviewing court." (*Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647; see *Lafferty v. Wells Fargo Bank* (2013) 213 Cal.App.4th 545,

30

571−572 [plaintiff forfeited challenge to summary adjudication by failing to address how the trial court erred].)

By failing to cite admissible evidence and explain why that evidence creates a triable issue of fact based on the applicable legal standard, Garcia has forfeited his challenge to that portion of the court's order addressing his non-wage-order claims. Accordingly, summary adjudication is proper as to the first cause of action for wrongful termination in violation of public policy; the fourth cause of action for failure to pay overtime; the seventh cause of action for waiting time penalties; and the eighth cause of action for UCL violations insofar as it rests on the aforementioned claims.

DISPOSITION

The judgment is reversed. The matter is remanded with instructions that the trial court vacate its order granting summary judgment and enter a new order granting summary adjudication as to Garcia's non-wage-order claims (causes of action 1, 4, 7, and 8 to the extent resting on the foregoing) and denying summary adjudication as to the wage order claims (causes of action 2, 3, 5, 6, and 8 to the extent resting on the foregoing). Each side shall bear its costs on appeal.

DATO, J.

WE CONCUR:


HALLER, Acting P. J.


GUERRERO, J.

32